IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF PHOENIX M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF PHOENIX M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AUDRA H., APPELLANT.

Filed October 15, 2019.    No. A-19-281.

Appeal from the Separate Juvenile Court of Lancaster County: LINDA S. PORTER, Judge. Affirmed.

Lisa F. Lozano for appellant.

Patrick Condon, Lancaster County Attorney, and Haley N. Messerschmidt for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Audra H. appeals from the order of the separate juvenile court of Lancaster County adjudicating her minor child, Phoenix M., as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). For the reasons set forth below, we affirm.

## BACKGROUND

On December 10, 2018, the State filed a motion in the juvenile court seeking emergency temporary custody of Phoenix, who was 15 years old. Lincoln Police Officer Trey Wayne stated in an affidavit supporting the State's motion that there was an altercation involving Phoenix, Audra, and Phoenix's stepfather, Daniel B., on December 8. As a result of the altercation, Phoenix

- 1 -

was taken to the hospital and received treatment for a cut to his hand. Audra refused to pick Phoenix up from the hospital, and refused to allow him to return to her home after he was released. Audra informed Wayne that she left her home at 16 years of age and survived, and Phoenix should be okay as well. The court granted the State's motion, and Phoenix was placed in the care of the Nebraska Department of Health and Human Services (DHHS).

On December 11, 2018, the State filed a petition seeking to adjudicate Phoenix under § 43-247(3)(a). The State alleged that Phoenix was abandoned by Audra; that he lacked proper parental care by reason of the fault or habits of Audra; that Audra neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of Phoenix; and that as a result of the December 8 altercation, Phoenix was in a situation dangerous to his life or limb or injurious to his health or morals. Prior to a hearing being held on the State's petition, the parties stipulated that Phoenix was to remain under the care of DHHS. A hearing was held on the State's petition in February 2019.

At the hearing, Phoenix testified regarding the December 8, 2018, altercation. He stated that he left home earlier that day without permission and went to his friend's house. When he returned, he attempted to enter through the back door and walk to his room; however, Daniel and Audra prevented him from entering, and pushed him back onto the porch and then locked the door. After he was locked out of his house, Phoenix punched the backdoor window, breaking the glass and cutting his hand. Daniel came outside and scuffled with Phoenix, during which time Phoenix punched Daniel in the face and pushed him down the porch steps. Phoenix fell down the steps with Daniel and laid on his legs, preventing Daniel from getting up. Audra came outside and attempted to move Phoenix off of Daniel. Phoenix testified that he got off Daniel and laid on the ground until his parents went in the house. Phoenix then walked around the neighborhood to cool off until the police arrived. He was then taken to the hospital.

Wayne testified that although he was not the officer that responded to Audra's initial call, he was dispatched to the house when the hospital was ready to release Phoenix. According to Wayne, when he requested Audra to pick up Phoenix, she refused. She informed him that Phoenix was not welcome in her home because her family did not feel safe with him there. When pressed by Wayne as to why her family did not feel safe with Phoenix at the house, Audra stated only that Daniel had received a ticket following the altercation with Phoenix. After Wayne told Audra that she could receive a citation for child neglect if she did not pick up Phoenix from the hospital, Audra stated "take me to jail then." Audra continued her refusal to pick up Phoenix and would not provide the names of any friends or family who could care for him. Phoenix was ultimately placed in child protective custody and taken to foster care.

The State also presented evidence from the DHHS initial assessment worker assigned to Phoenix's case. She testified that Phoenix was at risk of future harm due to the lack of care provided by Audra, and the possibility of another altercation. She also testified that Audra's refusal to allow Phoenix back into her home deprived him of shelter and supervision, and placed him at risk because it was cold outside that night. Furthermore, the worker testified that Phoenix was at risk of emotional harm due to Audra's abandonment of him.

Phoenix testified that similar altercations had occurred with his parents over the past 5 years. He admitted to often leaving his house without permission, and when he would come home

his parents would lock him out of the house. Phoenix stated that a similar incident occurred in November 2018, when he attempted to enter his house, was locked out, and then wrestled with Daniel in the front yard, causing a neighbor to intervene.

Daniel testified on behalf of Audra. Daniel stated that when Phoenix entered the house on December 8, 2018, Phoenix immediately started pushing, shoving, and swinging at him and Audra. Daniel then pushed Phoenix out of the house, after which Phoenix pushed him down the steps and began twisting Daniel's arm. Daniel freed himself from Phoenix and locked the back door. After Phoenix punched the glass window, Audra called the police and Daniel went outside and scuffled with Phoenix again.

Daniel testified that Phoenix often left home without permission. He also indicated that Phoenix has previously been aggressive toward him. On prior occasions when Phoenix left home and was subsequently locked out of the house, Daniel and Audra would discuss appropriate behaviors with Phoenix, telling him that he could not leave the house without telling them. This had also been discussed during Phoenix's therapy, in which Daniel and Audra participated. According to Daniel, the cycle of Phoenix leaving, coming home, and then having a disagreement, had been something that he has tried "painstakingly" to problem solve with Phoenix's therapist. Daniel stated that on the night of December 9, 2018, he and Audra hoped Phoenix would be accepted by the "CAPS program" at the hospital to receive treatment for his behavior. He further stated that he had concerns with Phoenix returning to the house after the altercation because Phoenix posed a risk of danger to him, Audra, and their daughter.

After the hearing, the court adjudicated Phoenix under § 43-247(3)(a). The court found the State had proved by a preponderance of the evidence that Phoenix lacked proper parental care by reasons of the fault or habits of Audra, and that Audra neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of Phoenix, based on the physical altercation which occurred on December 8, 2018, and Audra's subsequent refusal to pick Phoenix up from the hospital and refusal to allow him to return to her home.

The court found Phoenix's testimony that he did not enter the home in a belligerent manner more credible than Daniel's testimony that Phoenix entered the home and immediately attacked Daniel and Audra. The court also found that Phoenix broke the window in response to Daniel and Audra pushing him out of the house and locking the door. The court further stated that there was not credible evidence presented indicating that Phoenix posed a danger to himself or the family, and without such evidence, Audra was not justified in refusing to pick Phoenix up from the hospital or in refusing to allow him into the home. Audra appeals.

## ASSIGNMENTS OF ERROR

Audra assigns, restated, that the juvenile court erred by adjudicating Phoenix under § 43-247(3)(a).

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Brian B. et al.*,

268 Neb. 870, 689 N.W.2d 184 (2004). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

Section 43-247(3)(a) states that the juvenile court has jurisdiction of any juvenile who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile. To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013).

The purpose of the adjudication phase is to protect the interests of the child. *Id*. The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. *In re Interest of Justine J. et al., supra*. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id*. The State must prove such allegations by a preponderance of the evidence. *Id*.

Here, the record supports the juvenile court's finding that Phoenix lacked proper parental care by reason of the fault or habits of Audra, and that Audra neglected or refused to provide proper or necessary subsistence, education, or other care necessary for Phoenix's health, morals, or well-being. Phoenix testified that after he returned home on December 8, 2018, he was pushed outside and his parents locked him out. After breaking a window, he and Daniel scuffled outside, police arrived, and Phoenix was taken to the hospital. When Phoenix was released from the hospital, Audra refused to pick him up and refused to allow him to return to the home. When told that she could not refuse to allow Phoenix to return to the home, Audra stated "take me to jail then." Audra's actions confirm that she refused to provide necessary care for Phoenix's health and well-being.

Likewise, the record also supports the court's finding that Phoenix was at risk of harm due to Audra's refusal to provide necessary care for him. The DHHS worker testified that Phoenix was at risk of future harm and that there could be another altercation with his parents. Phoenix was a 15-year-old boy who had no place to go; therefore he lacked supervision and shelter, and was at risk of emotional harm.

Audra asserts that her acts that evening were reasonable because there was sufficient evidence presented that Phoenix posed a risk of harm to her and her family. Audra emphasizes the numerous services the family participated in with Phoenix, including placement at "CAPS" and Boys Town, as well as police calls to address Phoenix's behavior. While there is evidence of past aggression by Phoenix and Audra's frustration with the situation is understandable, we agree with the juvenile court that the evidence was not of such a nature that Audra's refusal to allow Phoenix into the home or pick him up from the hospital was justified.

Daniel testified that he and Audra participated in Phoenix's therapy; however, when asked what the therapy was for, Daniel stated "I don't know, it's hard to explain. I mean to get through to him how we care and to interact." Further, although Phoenix testified that he spent time with "CAPS" and at Boys Town, we do not find evidence in the record indicating the reason for his placement in such programs. Thus, while there is evidence that Phoenix engaged in various forms of therapy, there is no evidence that he did so due to aggressive or assaultive behavior as opposed to defiant behavior.

Although Daniel testified that Phoenix had been aggressive toward him in the past, Phoenix's testimony indicated that his aggressive behavior occurred when his parents attempted to lock him out of the house. As iterated above, the court expressly found Phoenix's testimony more credible than Daniel's. We give deference to this determination. When the evidence is in conflict in a juvenile case, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Consequently, the record supports the juvenile court's finding that Audra's refusal to allow Phoenix back into the house or pick him up from the hospital was not reasonable and supports a finding of parental neglect.

Audra agrees that Phoenix is in need of services and out of home placement; she takes issue, however, with the court's finding that adjudication is necessary due to her faults and habits. Rather, Audra asserts that Phoenix's situation arises through his own actions, not hers. However, it was Audra's actions which placed Phoenix at risk of harm. She and her husband locked Phoenix out of the house and she refused to pick him up from the hospital, or allow him to return to her home. Thus, Phoenix lacked proper parental care due to Audra's refusal to provide necessary care for his health and well-being.

Upon our review of the record, the State proved by a preponderance of the evidence that Phoenix lacked proper parental care by reason of the fault or habits of Audra, and that Audra neglected or refused to provide proper or necessary care for Phoenix's health and well-being. Therefore, the juvenile court did not err in adjudicating Phoenix under § 43-247(3)(a).

## CONCLUSION

For the reasons stated above, we find the juvenile court properly adjudicated Phoenix as a child within the meaning of § 43-247(3)(a) due to the fault or habits of Audra.

AFFIRMED.